**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL BLANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-CV-903 NAB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Daniel Blank brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the Commissioner's final decision denying his

application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security

income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* All matters

are pending before the undersigned United States Magistrate Judge, with consent

of the parties, pursuant to 28 U.S.C. § 636(c). Because the Commissioner's final

decision is supported by substantial evidence on the record as a whole, it is

affirmed.

## I. Procedural History

Plaintiff applied for DIB and SSI on April 11, 2013, claiming that he became

disabled on September 11, 2012, because of bipolar disorder, borderline personality disorder, attention deficit disorder, and dysthymia. Plaintiff was twenty-eight years of age when he filed his applications. Upon initial consideration, the Social Security Administration denied plaintiff's claims for benefits. At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on December 2, 2013, at which plaintiff and a vocational expert testified. On January 30, 2014, the ALJ issued a decision denying plaintiff's claims for benefits, finding vocational expert testimony to support a finding that plaintiff could perform work as it exists in significant numbers in the national economy. (Tr. 8-23.) On March 13, 2014, the Appeals Council denied plaintiff's request to review the ALJ's decision. The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing specifically that the ALJ improperly discredited his subjective complaints and failed to properly evaluate the opinion of his treating physician, Dr. Arain. Plaintiff requests that the final decision be reversed and that the matter be remanded for an award of benefits or for further proceedings.

For the reasons that follow, the ALJ did not err in his decision.

## II. Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the hearing on December 2, 2013, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff lives in a mobile home with a friend (his former fiancé), her two children ages six and four, and her mother. (Tr. 43, 46.)

Plaintiff testified that he last worked as a cook at Hardee's in December 2012. Plaintiff worked for about one month at that job and was fired because he was not producing fast enough and was occasionally late to work. (Tr. 33-34, 55.) Earlier in 2012, plaintiff worked as a nurse's aide. This job ended because plaintiff missed too many days on account of his depression. Plaintiff also testified that he was unable to obtain his certification for this job because his mind would go blank during tests. (Tr. 34, 57.) Plaintiff testified that he also performed temporary part-time work as a general laborer during the previous ten years, which included work as a forklift driver and warehouse worker, as well as temporary work at Wal-Mart. (Tr. 34-35.) Plaintiff testified that he worked for three months as a cashier at a gas station but was fired from this job because he was occasionally late and sometimes failed to appear for work. (Tr. 53-54.) Plaintiff testified that he was previously in the military but was "kicked out" because of incidents between him and his sergeant involving threats made by plaintiff. (Tr. 35-36, 38.) Plaintiff worked as a

correctional officer after leaving the military, but left after one month because of his anger. (Tr. 53.)

Plaintiff testified that he was treated as a child for bipolar disorder, manic depression, anger, and anxiety and received treatment until he was seventeen years old. From 2004 to 2008, plaintiff was in the military and received no medication for his bipolar disorder. (Tr. 50.) Plaintiff testified that he currently takes medication for depression, anger, and chemical imbalance but that the medication does not make him 100 percent better because he gets used to it after which it does not work as well. Plaintiff's medications continue to be adjusted. His current medications include Wellbutrin, BuSpar, and Seroquel. (Tr. 37-39.) Plaintiff testified that he experiences drowsiness and nausea as side effects of his medications. (Tr. 65.)

Plaintiff testified that he experiences bouts of depression even though he takes medication. Once or twice a month he stays in bed for three or four days and sleeps. The most recent bout occurred the week prior to the hearing during which time plaintiff stayed in bed for two days and tried to "sleep it away." (Tr. 38.)

With respect to his anger, plaintiff testified that he gets edgy and takes things the wrong way, whether it be with people he knows or with strangers at a grocery store. Being around people bothers him a little. He likes to be alone. Plaintiff testified that he tries to perform errands quickly or asks his friend to do so,

so that he does not have to.  Plaintiff testified that it was his anger that led to his "Other than Honorable Discharge" from the military in 2008.  (Tr. 38, 41, 48-49, 59.)  He also had verbal altercations with supervisors at work.  (Tr. 56-57.)

Plaintiff testified that he has difficulty with focus and concentration and is easily sidetracked.  Plaintiff had this problem when he worked and got into trouble because he was told to do numerous things but would forget and repeatedly ask for guidance.  (Tr. 39-40.)  Plaintiff also becomes sidetracked with his daily activities but receives some reminders from his mother and friend, including reminders to take medication.  (Tr. 40-41.)

As to his daily activities, plaintiff testified that he sometimes sleeps and sometimes plays with his dog.  Both plaintiff and his friend take care of the dog.  Plaintiff also plays video games during the day.  Plaintiff spends very little time on the computer, which has no internet access.  (Tr. 60-61.)  Plaintiff testified that he sometimes cooks and does the dishes, but his friend does most of the household chores, including yardwork.  (Tr. 43.)  Plaintiff testified that he leaves his home two or three times a month to run errands or to visit his mother whom he sees once every month or two.  Plaintiff does not visit any friends because he has difficulty making friends and trusting people.  Plaintiff does not drive and does not have a driver's license.  His roommate/friend, mother, and grandmother take him to where he needs to go.  (Tr. 44-45.)  Plaintiff testified that he watches his friend's children

"once in a blue moon" when they are sick.  (Tr. 47-48.)  Plaintiff does not read.

He watches movies on television "halfway."  Plaintiff testified that he engages in

no outdoor activities other than sitting on the porch.  On a rare occasion, he goes

fishing with his mother.  (Tr. 62-63.)

B.      Testimony of Vocational Expert

Bob Hammond, a vocational expert, testified at the hearing in response to

questions posed by the ALJ and counsel.

The ALJ asked Mr. Hammond to consider a person twenty-nine years of age

with a high school education and no past relevant work experience.  The ALJ

asked Mr. Hammond to assume that the person was able to perform the full range

of exertional work but would need to avoid ladders, ropes, scaffolds, and hazards

such as dangerous machinery and unprotected heights.  (Tr. 66-67.)  The ALJ

asked Mr. Hammond to further assume that the person could not drive as part of

his work duties and that he

> would be able to perform simple and routine tasks but not in a high-
> pace production environment where there were would be strict
> production quotas, where the individual would have occasional
> interaction with supervisors and co-workers, which I'll define as
> cumulatively, comprising no more than one-third of their workday.
> And the hypothetical individual would not be required to
> communicate with the general public on behalf of the employer.

(Tr. 67.)  Mr. Hammond testified that such a person could perform work as a

washer/cleaner of vehicles and equipment, of which 100,000 such jobs exist

nationally; as an institutional cleaner, of which 105,000 such jobs exist nationally; and as a cleaner II, of which 116,000 such jobs exist nationally.  (Tr. 67-68.)

Counsel then asked Mr. Hammond to consider this person to be further limited by being absent from the workplace more than two days per month on a consistent basis, to which Mr. Hammond responded that all employment positions would be eliminated.  Counsel then asked Mr. Hammond to consider that the person would have difficulty sustaining concentration and would consistently be off task more than twenty percent of the workday, to which Mr. Hammond responded that all employment positions would be eliminated.  (Tr. 68-69.)

### III.  Education and Medical Records Before the ALJ

A.    <u>Education Records</u>

In September 2003, while plaintiff was in the twelfth grade, his Individualized Education Program underwent review.  Testing results showed plaintiff to be performing at the fifth grade level in math and at the ninth grade level in reading comprehension.  His diagnosis of Emotionally Disturbed was noted to affect his performance in the classroom.  Plaintiff was noted to sleep excessively during class.  Plaintiff had previously obtained a full scale IQ of 90, a verbal IQ of 88, and a performance IQ of 95 on the WISC-III taken in 1999.  It was noted that plaintiff scored in the 53rd percentile in science on the 2001 MAP test.  For the current school year, it was determined that plaintiff would be placed in the

special education room 900 minutes a week, which represented more than 60% of the time.  (Tr. 326-46.)

B.      Medical Records

Plaintiff underwent a consultative psychological evaluation on September 14, 2012.  Dr. David Peaco noted plaintiff to have an eleventh grade education with a GED.  It was noted that plaintiff received special education services for learning problems and for being "behavior disordered."  Plaintiff reported being unemployed since June 2012, having been fired from his job at that time for missing work.  Plaintiff reported that he was under a lot of stress at the time because of the suicide death of his father.  Plaintiff reported to Dr. Peaco that he began receiving mental health treatment when he was six years of age, but has not sought treatment since 2002 when he stopped taking medication in order to join the military.  Plaintiff reported no history of drug or alcohol abuse and stated that he currently had about one drink per week.  It was noted that plaintiff lost his driver's license after a second arrest in 2011 for Driving While Intoxicated (DWI).  Mental status examination showed plaintiff to be casually dressed and to have normal motor activity.  Plaintiff was cooperative and his orientation was intact.  Dr. Peaco noted plaintiff's flow of thinking to be somewhat unfocused.  Plaintiff's mood was depressed and his affect was slightly restricted.  Plaintiff reported having problems paying attention.  Dr. Peaco noted plaintiff's delayed memory to be below average

and his working memory to be average. Plaintiff's fund of general information

was well below average. Dr. Peaco noted the results of plaintiff's December 1999

IQ testing to place him in the lower portion of average intellectual functioning. Dr.

Peaco also noted that plaintiff's Freedom from Distractibility Index was 75, which

placed him in the borderline range. Plaintiff reported being depressed at times and

having suicidal thoughts. He also reported having intense anxiety experiences in

his life with chronic, frequent anxiety. Plaintiff reported being somewhat active

with his daily activities in that he cared for his home, worked on his truck, and was

looking for a job. Dr. Peaco noted plaintiff to have a social life with a girlfriend.

Upon conclusion of the evaluation, Dr. Peaco diagnosed plaintiff with generalized

anxiety disorder, adjustment disorder with depressed mood, and disorder of written

expression. Dr. Peaco assigned plaintiff a Global Assessment of Functioning

(GAF) score of 60.[1] Dr. Peaco opined that plaintiff was able to understand and

remember simple instructions and was mildly impaired in his persistence in

completing tasks. Dr. Peaco opined that plaintiff's concentration was moderately

---

[1] "According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.
Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the
individual's overall level of functioning,'" *Hudson v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir.
2003), and consists of a number between zero and 100 to reflect that judgment, *Hurd v. Astrue*,
621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates moderate
symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or
coworkers). DSM-TR-IV at 34.

impaired.  Dr. Peaco further opined that plaintiff's social functioning was mildly impaired and that his capacity to cope with and adapt to the world around him was moderately impaired because of chronic anxiety and periods of depression.  (Tr. 323-25.)

Plaintiff underwent a consultative psychological evaluation on October 15, 2012.  Plaintiff reported to Karen A. MacDonald, Psy.D., that he had mood swings, racing thoughts, reactive anger, and insomnia.  It was noted that plaintiff had not taken any medication for ten years.  Plaintiff reported having suicidal ideation. Plaintiff denied having any drug or alcohol problems.  Plaintiff's intermittent job history was noted, and plaintiff reported that he could not keep a job because of depression and because he did not care.  Plaintiff reported having trouble with his anger and being argumentative with authority figures.  As to his daily activities, plaintiff reported having obsessive-compulsive traits, including issues with clutter and with time and needing things in a certain order.  Plaintiff reported that he lived with his girlfriend and that he and his girlfriend share the household chores. Plaintiff also reported doing community service four hours day, going to his father's house to help him, and that he enjoyed fishing with his mother.  Mental status examination showed plaintiff to appear to be experiencing mood swings. His speech and thought processes were normal.  Dr. MacDonald noted plaintiff to be functioning intellectually in the average to low average range.  Plaintiff's ability

to perform math functions, including complex problems, was intact.  His delayed auditory memory was impaired as well as his ability to recall and follow detailed instructions.  Plaintiff's ability to recall and follow simple instructions was not impaired; nor was his attention, calculation, or immediate auditory memory.  Pace, persistence, and abstract motor speed were impaired.  Dr. MacDonald noted plaintiff to score over two standard deviations from the average mean on the mini-mental status examination.  Dr. MacDonald diagnosed plaintiff with bipolar I disorder, most recent episode mixed; and obsessive-compulsive personality disorder.  She considered plaintiff's cognitive impairment to be related to symptoms of bipolar disorder and obsessive-compulsive disorder.  Plaintiff was assigned a GAF score of 50.[2]  (Tr. 450-52.)

Plaintiff was admitted to the emergency department at Progress West Healthcare Center on February 16, 2013, with suicidal ideation after taking between thirty and fifty 500mg tablets of Naproxen.  Plaintiff reported that everything was happening all at once and that he had been trying to "keep all of [his] stuff straight."  Plaintiff's history of depression was noted, as well as a history of multiple suicide attempts.  Plaintiff was currently determined to be at high risk for suicide, but he reported that he wanted help.  (Tr. 390, 394.)

---

[2] A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  DSM-TR-IV at 34.

After being medically cleared at Progress West, plaintiff was admitted to Center Pointe Hospital that same date for inpatient treatment. Upon admission, plaintiff reported having continued suicidal thoughts and that he had homicidal thoughts toward his sister about one year prior. Plaintiff reported having a primary care physician but no psychiatrist or therapist. It was noted that plaintiff was not taking any medications. Plaintiff's GAF score upon admission was 35.[3] He participated in individual and group therapy during his admission and was placed on Lexapro and Seroquel. Plaintiff was discharged on February 20 with a diagnosis of major depressive disorder and a GAF score of 70.[4] He was noted to be anxious at discharge, but mental status examination was otherwise normal in all respects. Plaintiff was prescribed Lexapro and Seroquel and was scheduled for follow up at Crider Center. (Tr. 415-18.)

On March 12, 2013, plaintiff was evaluated at the Crider Center by Dr. M. Arain, a psychiatrist, for initial assessment regarding medication management. Plaintiff reported that he suffered from unpleasant feelings, emotions, or sensations nearly every day and experienced daily back pain. Plaintiff reported having

---

[3] A GAF score between 31 and 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work). DSM-IV-TR at 34.

[4] A GAF score of 61 to 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional

decreased energy level. Plaintiff was noted to be taking Keflex, Seroquel, and Lexapro, and he reported that his mood and depression were better controlled with medication. Plaintiff denied any suicidal or homicidal ideations. Plaintiff reported a history of racing thoughts, decreased sleep, irritability, easy distractibility, decreased focus, increased energy, and increased spending of money. Plaintiff also reported a history of anxiety, anger issues, and low self-esteem. Plaintiff reported three DWI arrests, with his last being in June 2012. Plaintiff reported that he currently drank alcohol on weekends. Dr. Arain diagnosed plaintiff with bipolar disorder II, anxiety disorder, history of cannabis and methamphetamine abuse, and alcohol abuse. A treatment plan was developed for medication management and psychiatric care, and Seroquel and Lexapro were prescribed. (Tr. 424-32, 438-41.)

Plaintiff returned to Dr. Arain on May 15, 2013, and reported being depressed and having anger and rage problems. No manic behaviors were reported, and plaintiff denied any hallucinations, delusions, or paranoid thoughts. Plaintiff reported being compliant with his medications. Plaintiff reported having sexual side effects with his medications, but no other side effects were noted. It was noted that plaintiff had had no alcohol since his last visit. Mental status examination showed plaintiff's grooming and eye contact to be fair. His behavior

---

truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

was noted to be appropriate and cooperative. Plaintiff was oriented times three. Dr. Arain determined plaintiff's fund of knowledge to be adequate, and plaintiff's attention and concentration were within normal limits. Plaintiff's speech was normal in all respects, and his thought process was intact. Plaintiff reported his mood to be good. His affect was noted to be restricted. Plaintiff's thought associations were within normal limits, and he had no suicidal or homicidal ideations. Plaintiff's judgment and insight were noted to be fair. Dr. Arain continued plaintiff in his diagnoses of bipolar disorder II, anxiety disorder, alcohol abuse, and borderline personality disorder. Dr. Arain recommended that plaintiff participate in individual counseling. Plaintiff was instructed to discontinue Lexapro, and Wellbutrin and Seroquel were prescribed. (Tr. 433-37.)

On July 24, 2013, Stanley Hutson, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's affective disorder, personality disorder, alcohol and substance addiction disorder, and anxiety disorder caused mild restriction in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. Dr. Hutson found there to be insufficient evidence to determine whether plaintiff experienced repeated episodes of decompensation of extended duration. (Tr. 80-82.) In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr.

- 14 -

Hutson opined that plaintiff had no limitations with understanding and memory but experienced moderate limitations in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or in proximity to others without being distracted by them. Dr. Hutson further opined that plaintiff experienced social limitations in that he was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. With respect to adaptation, Dr. Hutson opined that plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting but otherwise was not significantly limited. Dr. Hutson concluded that plaintiff had the ability to understand and follow instructions, could make work decisions and complete routine tasks, appeared capable of adapting to a work setting, and would benefit from limited social interaction in the work setting. (Tr. 83-84.)

On August 5, 2013, plaintiff reported to Dr. Arain that he continued to feel depressed, had racing thoughts, and was distracted. Plaintiff reported sleeping well. Plaintiff reported that he was compliant with his medication and had no side effects. Mental status examination showed plaintiff to be oriented times three. He had fair grooming and eye contact, and his behavior was appropriate and cooperative. Plaintiff reported his mood to be "steady," and Dr. Arain noted

plaintiff to have a full affect. Plaintiff's attention and concentration were within normal limits, and his thought processes and associations were normal and intact. Plaintiff had no suicidal or homicidal ideation. Plaintiff's judgment and insight were noted to be fair. Plaintiff was continued in his diagnoses and was prescribed Wellbutrin, BuSpar, and Seroquel. (Tr. 455-60.)

In a letter addressed To Whom It May Concern dated November 11, 2013, Dr. Arain reported that plaintiff's psychiatric symptoms were in partial remission with medication. Dr. Arain further wrote:

> He has a history of anxiety and depression that caused repeated episodes of decompensation and difficulties in maintaining social functioning. He may have difficulty working full-time job on a sustained basis, deal with work related stress, behave in emotionally stable manner, and demonstrate reliability. His impairment may cause him to be absent from work.

(Tr. 447.) Dr. Arain also wrote that he would recommend vocational rehabilitation and opined that plaintiff may benefit from individual counseling to develop coping skills. (*Id.*)

## IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through September 30, 2017, and had not engaged in substantial gainful activity since September 11, 2012, the alleged onset date of disability. The ALJ found plaintiff's major depressive disorder, anxiety disorder,

substance addiction disorder, and personality disorder to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-14.)

The ALJ determined that plaintiff had the RFC to perform the full range of work at all exertional levels but with the following non-exertional limitations:

> he cannot climb ladders, ropes, or scaffolds; he cannot have exposure to workplace hazards such as dangerous machinery or unprotected heights; he cannot drive as a part of his work duties; he can perform simple and routine tasks, but not in a high pace production environment; he cannot perform with strict production quotas; he can occasionally interact with supervisors and co-workers cumulatively no more than 1/3 of workday; and, he cannot be required to communicate with the general public on behalf of employer.

(Tr. 15.)  The ALJ found plaintiff not to have any past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, washer, institutional cleaner, and cleaner II.  The ALJ thus found plaintiff not to be under a disability at any time from September 11, 2012, through the date of the decision.  (Tr. 21-22.)

# V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether

- 18 -

the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The

decision may not be reversed merely because substantial evidence could also support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

Plaintiff claims that the ALJ's decision is not based upon substantial evidence on the record as a whole inasmuch as he improperly discredited plaintiff's subjective complaints of disabling symptoms and erred in his determination to accord little weight to the opinion of his treating psychiatrist, Dr. Arain. For the following reasons, the ALJ did not err.

A.    Credibility

When evaluating a claimant's credibility, the ALJ must consider all evidence relating to the claimant's complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

When, as here, a claimant contends on judicial review that the ALJ failed to

properly consider his subjective complaints, the Court's duty is to ascertain whether the ALJ considered all of the evidence relevant to the claimant's complaints under the *Polaski* standards and whether the evidence so contradicts his subjective complaints that the ALJ could discount his testimony as not credible. *Masterson v. Barnhart,* 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ considers the *Polaski* factors and explicitly discredits a claimant's complaints for good reason, the Court should defer to that decision. *Halverson,* 600 F.3d at 932. The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir. 2005); *Pearsall*, 274 F.3d at 1218.

Here, the ALJ acknowledged the required factors and considered plaintiff's credibility based upon the record as a whole. The ALJ thoroughly discussed the evidence of record, identified inconsistencies relating to the *Polaski* factors, and found plaintiff's complaints not to be entirely credible. Because this determination is supported by good reasons and substantial evidence, the Court defers to this decision.

First, the ALJ noted the objective medical evidence to show that plaintiff

exhibited behavioral impairments during consultative examinations in September and October 2012 and was admitted for inpatient care in February 2013. The ALJ noted, however, that prior to this February 2013 hospitalization, plaintiff did not receive any mental health treatment and indeed reported that he had not seen a doctor in ten years. *Cf. Brace v. Astrue*, 578 F.3d 882, 886 (8th Cir. 2009) (no error in discrediting claim of disabling symptoms when record showed claimant not to be taking medication during period when symptoms were assessed). The record shows that plaintiff's conditions improved once he began receiving regular treatment, and indeed that plaintiff acknowledged that medication helped his symptoms with no reported adverse side effects. *See Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (medication alleviated symptoms with no record of adverse side effects); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (impairments that are controllable or amenable to treatment do not support a finding of disability).

The ALJ also noted the level of plaintiff's daily activities to be inconsistent with his subjective complaints of disabling symptoms. The ALJ specifically noted plaintiff's report that he cared for his friend's children and shared household chores as well as record evidence that showed him to have worked part-time, performed community service, often visited his father to help him, and regularly interacted with his mother which included going fishing. Plaintiff also reported in

his Function Report that he prepared meals, had no problems with personal care, watched television with his friend, cared for multiple pets, went to the grocery store once a week for about forty minutes, and could go out alone. (Tr. 285-88.) Such a fairly normal routine is inconsistent with complaints of disabling cognitive and mental symptoms. *See Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010) (accomplishing basic household tasks, working on computer, and successful interaction with family members); *Halverson,* 600 F.3d at 932 (caring for personal needs and grooming, caring for pet, preparing meals, performing household chores, driving a car, running errands, going shopping, and watching television). *See also Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) (daily activities, which included work activity, inconsistent with disabling complaints).

Plaintiff contends that the ALJ failed to consider the extent to which he performed these daily activities, arguing that his testimony at the administrative hearing provided context to the other evidence of record. An ALJ must assess a claimant's credibility based upon a review of the record a whole. Where such review shows the claimant not to be as limited as his testimony would suggest, the ALJ does not err in discrediting the testimony. *See Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010). A review of the ALJ's decision here shows that he considered the entirety of the record, including testimony and reports obtained from plaintiff

and third parties,[5] and identified numerous inconsistencies with respect to plaintiff's performance of daily activities showing that the claimed disabling symptoms were not as severe as alleged. Substantial evidence supports the ALJ's conclusions regarding plaintiff's daily activities, and the undersigned defers to such findings.

Nor does the ALJ's consideration of part-time work activity render his credibility determination flawed. Contrary to plaintiff's assertion, the ALJ did not consider such work activity as evidence that plaintiff is able to perform substantial gainful activity or that he maintains an ability to work. Instead, the ALJ considered this activity in determining the strength of plaintiff's credibility, finding it to be inconsistent with plaintiff's complaints of disabling symptoms. An ALJ is permitted to consider work activity in this context. *See Goff*, 421 F.3d at 792.

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported

---

[5] Although plaintiff claims that the ALJ failed to consider the statements made in his mother's Third Party Function Report that were consistent with his claims of limited daily activities, the undersigned notes that the ALJ addressed this report and noted that plaintiff reportedly spoke with his mother every day, went fishing with his mother once a month, had cookouts, performed all of his daily and weekly chores, and worked. For the reasons stated above, this third-party report of plaintiff's activities support the ALJ's finding that plaintiff's daily activities are inconsistent with his claim of disabling symptoms. *See Ostronski v. Chater*, 94 F.3d 413, 419

by good reasons and substantial evidence, the Court defers to this determination. *McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013); *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012).

B.   Opinion Evidence

Upon concluding that plaintiff's subjective complaints were not entirely credible, the ALJ turned to the medical opinion evidence of record, including the opinions expressed in Dr. Arain's November 2013 letter.  The ALJ accorded Dr. Arain's opinions little weight, finding that they were inconsistent with other evidence of record and failed to specify any functional limitations.  For the following reasons, the ALJ's determination to accord little weight to Dr. Arain's opinion evidence is supported by substantial evidence on the record, and the ALJ did not err in this determination.

When evaluating opinion evidence, an ALJ is required to explain in his decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well

(8th Cir. 1996).

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." *Id.* Inconsistency with other substantial evidence alone is a sufficient basis upon which an ALJ may

discount a treating physician's opinion.  *Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005).

Here, the ALJ properly discounted Dr. Arain's opinions inasmuch as they were inconsistent with other substantial evidence of record.  The ALJ specifically noted that although Dr. Arain opined that plaintiff may have difficulty working full time, dealing with work-related stress, demonstrating reliability, and behaving in an emotionally stable manner, the record showed multiple relatively normal mental status examinations.  Indeed, a review of the record shows that once plaintiff began receiving regular mental health treatment, his mental status examinations repeatedly showed appropriate and cooperative behavior, normal attention and concentration, normal thought processes and associations, and fair insight and judgment.  Where a claimant's medical record repeatedly documents normal mental status examinations showing no abnormalities, an ALJ does not err in discounting as inconsistent a treating physician's opinion that the claimant is unable to maintain employment.  *See Halverson*, 600 F.3d at 929-30.

In addition, the ALJ noted that Dr. Arain described no specific functional limitations but instead generally stated that plaintiff should be referred to vocational rehabilitation.  Where a treating source provides little or no explanation for opined limitations, an ALJ does not err in according little weight to that source's opinions.  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

# VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled through the date of his decision is supported by substantial evidence on the record as a whole, and plaintiff's claims of error are denied.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 14th day of August, 2015.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE